Regency Ctrs. Acquisition, LLC v. Crescent Acquisitions, LLC, 2018 NCBC 7.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| COUNTY OF MECKLENBURG | 17 CVS 11354 |

REGENCY CENTERS ACQUISITION, LLC,

Plaintiff,

v.

CRESCENT ACQUISITIONS, LLC,

Defendant.

**ORDER AND OPINION ON DEFENDANT'S MOTION TO DISMISS**

THIS MATTER comes before the Court upon Defendant's Motion to Dismiss (N.C. R. Civ. P. 12(b)(6)). ("Motion", ECF No. 10.) Defendant seeks dismissal of the claims asserted against it in the Complaint (ECF No. 1): equitable estoppel by fraud, tortious interference with prospective economic advantage, unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1(a) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and recovery in *quantum meruit*.

THE COURT, having considered the Motion, the briefs and exhibits filed in support of and in opposition to the Motion, certain documents referenced in the Complaint, the arguments of counsel at the hearing, and other appropriate matters of record, concludes that the Motion should be GRANTED for the reasons set forth below.

> *McGuireWoods LLP, by Mark E. Anderson, Esq. and Tracey S. DeMarco, Esq., for Plaintiff Regency Centers Acquisition, LLC.*

> *Troutman Sanders LLP, by Kiran H. Mehta, Esq. and Sarah Ash, Esq., for Defendant Crescent Acquisitions, LLC.*

McGuire, Judge.

## I.    FACTS AND PROCEDURAL BACKGROUND

1.    The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. G.S. § 1A-1, Rule 12(b)(6) (hereinafter the North Carolina Rules of Civil Procedure will be referred to as "Rule(s)"). The Court only recites those facts included in the Complaint that are relevant to the Court's determination of the Motion. *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). The Court also may consider documents to which the Complaint specifically refers, even when such documents are submitted by the defendant. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

2.    Plaintiff Regency Centers Acquisition, LLC is a leading national landlord and development partner and has for many years maintained a development relationship with Whole Foods Market Group, Inc. ("Whole Foods"). (ECF No. 1 at ¶ 3.) Plaintiff currently "owns and/or manages twenty-three (23) shopping centers in which Whole Foods is the anchor tenant." (*Id.* at ¶ 3.) In North Carolina, Plaintiff served as the developer for one Whole Foods store, and is the landlord for two shopping centers of which Whole Foods is the anchor tenant. (*Id.* at ¶ 4.)

3.    Defendant Crescent Acquisitions, LLC is a North Carolina-based land developer with "expertise in multi-family development." (*Id.* at ¶¶ 2, 8.)

4.    In June 2010, Plaintiff began searching for a suitable location to develop a new Whole Foods store in Charlotte, North Carolina. (*Id.* at ¶ 5.) Plaintiff "invested significant time and resources to identify an appropriate location for the proposed

development." (*Id*. at ¶ 6.) Plaintiff ultimately decided to pursue the development on property located in the uptown area of Charlotte, North Carolina (hereinafter the "Charlotte Project"). (*Id*.)

5. "The cost of land required any potential retail development to be a part of a mixed-use development, with the retail portion only a minority use of the development." (*Id*. at ¶ 7.) Accordingly, Plaintiff needed a mixed-use development partner to lead the construction and development. (*Id*.) Plaintiff had recent experience working with Defendant on a residential development project in Raleigh, North Carolina." (*Id*. at ¶ 8.) At the time, however, Defendant "did not have a retail development platform, any experience in developing vertically integrated, grocery anchored mixed-use projects" and had not previously developed property for Whole Foods. (*Id*.) Nevertheless, Plaintiff decided to partner with Defendant on the Charlotte Project. (*Id*. at ¶ 9.)

6. On August 22, 2014, Plaintiff and Defendant entered into a Letter of Intent ("LOI") for the Charlotte Project. (*Id*.; LOI, ECF No. 12.2.) The LOI provides "[t]he general terms upon which Regency would be willing to purchase" the Charlotte Project once development of the property was completed. (ECF No. 12.2 at p. 1.) The LOI provides that Defendant would purchase the property for the Charlotte Project and would "perform all development services, including construction of the Whole Foods premises." (ECF No. 1 at ¶ 10.) The parties, however, "understood that [Plaintiff] was responsible for managing all aspects of Whole Foods' involvement in

the project, including site approval, negotiation of the letter of intent and the lease, and design of the retail component of the proposed development." (*Id.*)

7.     The LOI further provides that Plaintiff would purchase the retail component of the Charlotte Project from Defendant upon its completion. (*Id.*) Plaintiff alleges that the LOI provides that "[Plaintiff] would purchase the retail component in exchange for approximately $17.25 million." (*Id.*) The LOI, however, does not contain the $17.25 million figure. Instead, the LOI provides that the commercial retail component of the Charlotte Project would consist of 40,000 square feet of grocery retail area which Plaintiff would purchase for $365.00 per square foot, and an additional 7,500 square feet of other retail area which Plaintiff would purchase for $340.00 per square foot.[1] (ECF No. 12.2 at pp. 1, 2.)

8.     The LOI also contains the following provisions:

> The foregoing sets forth the general terms and conditions upon which Regency would be interested in purchasing the Property. It is not an offer nor is it a binding agreement, but merely an expression of Regency's interest. If the foregoing general terms and conditions are acceptable to you, please indicate such in the space provided below and return to us. We will then forward it to our attorneys to prepare and forward to you a contract which reflects these understandings. Neither of us shall be bound until an acceptable Purchase and Sale Agreement can be executed by each of us;

> and,

> *It is expressly understood and agreed by both parties that the foregoing proposal constitutes an outline for discussion*

---

[1] The $17.25 million figure apparently is based on a calculation, albeit with a minor math error, using the proposed square footage of the retail component times the price per square foot contained in the LOI: (40,000 x $365 = $14,600,000) + (7,500 x $340 = $2,550,000) = $17,150,000.

*purposes only with respect to purchasing the above-referenced property and does not create any contractual rights or obligations on the part of either party. Significant additional terms and conditions of the purchase agreement are yet to be negotiated and neither party is obligated to continue such negotiations. In no event shall any contractual rights or obligations exist until such time as a purchase agreement is fully executed and delivered by both parties. Accordingly, the parties agree not to rely on the terms of this letter and that any obligation incurred, funds spent and business opportunities lost are at each party's sole risk.*

(*Id.* at p. 6 (italics in original).)

9. In addition, the LOI contemplates a potential second phase of retail development as part of the Charlotte Project. The LOI contains a paragraph titled "Phase II" which provides "[Defendant] contemplates the Property being developed in two Phases . . . . Therefore, [Plaintiff] shall have a one-time right of first offer to purchase any Phase II Retail at cost plus 15% . . . ." (*Id.* at p. 5.)

10. After executing the LOI Plaintiff and Defendant began negotiating the terms of the Purchase and Sale Agreement ("PSA"). (ECF No. 1 at ¶ 14.) The parties exchanged several drafts of the PSA, with each party making changes to the terms of the drafted PSA. (*Id.*) Plaintiff, however, alleges that in the drafts exchanged between the parties the purchase price of $17.25 million "always remained the same." (*Id.*)

11. Simultaneously with the negotiation of the PSA, Plaintiff negotiated and agreed upon the terms of a lease with Whole Foods ("Whole Foods Lease"). (ECF No. 1 at ¶¶ 12, 15.) "At Whole Foods' request," the landlord on the Whole Foods Lease was changed from Plaintiff to Defendant "in a late draft of the lease." (*Id.* at ¶ 15.) It

is standard industry practice "[i]n multi-party commercial development projects . . . to execute a lease agreement that lists a master developer as the initial landlord during the project's construction phase, where the completed commercial project is intended to be sold to the development partner." (*Id.* at ¶ 11.)

12.     On December 24, 2014, Defendant and Whole Foods executed the Whole Foods Lease. (*Id.* at ¶ 15.) Plaintiff was not a signatory to the Whole Foods Lease. (*Id.* at ¶ 16.) The Whole Foods Lease contains the following provision:

> Notwithstanding anything to the contrary set forth herein, Tenant hereby acknowledges that Landlord intends to sell the Retail Unit(s) to Regency Centers, L.P., a Delaware limited partnership, or affiliate ("Regency") upon the completion of construction by Landlord of the Final Initial Landlord Work and the Tender Date (the "Planned Assignment"). Effective as of the Planned Assignment, Regency shall assume Landlord's obligations under this Lease which accrue after the date of such Planned Assignment, and the named Landlord hereunder shall be released from any liability under this Lease which accrues after the date of such Planned Assignment, and Tenant agrees to look solely to Regency as Landlord for the performance of such subsequently accruing obligations.

(*Id.*)

13.     On January 5, 2015, Plaintiff requested that Defendant confirm that Plaintiff's $17.25 million purchase-price offer was a "market offer," and also indicated that Defendant would require Plaintiff to purchase Phase II as a condition of the sale. (*Id.* at ¶¶ 18–19.) On January 28, 2015, Defendant followed up this request with an email to Plaintiff that stated, in relevant part, as follows:

> When we first entered into LOI discussions with you on [the Charlotte Project] it was not yet clear what the final program would be on-site. Since that time we have entirely redesigned the site, received better input on pricing,

negotiated the final specifications for Whole Foods and solidified our plans for the phase two development. As we have successfully navigated that process, our economics for the investment have continued to be squeezed.

As a result of the erosion of economics and our progress in our internal investment process, we need to address two questions in order to proceed with our deal with you. First, we need to ensure that we have a deal on both the phase one Whole Foods and the phase two retail. Second, we need something to support the fact that your offer for the overall retail component is in alignment with market.

(B. Collins Jan. 28, 2015 email, ECF No. 12.3.)

14. In response to Defendant's requests, Plaintiff engaged Dr. Howard Biel, "a reputable mid-Atlantic developer, to assess the deal and provide an opinion regarding market substantiation[.]" (ECF No. 1 at ¶ 22.) On February 13, 2015, Plaintiff provided Dr. Biel's assessment to Defendant. (*Id.* at ¶ 23; Chain of emails re: H. Biel opinion, ECF No. 12.4.) Plaintiff alleges that Dr. Biel "confirmed that the agreed-upon $17.25 million purchase price was consistent with the market price." (ECF No. 1 at ¶ 23.) Defendant did not respond to Dr. Biel's assessment or engage in any further negotiations with Plaintiff regarding the purchase price for the Charlotte Project. (*Id.* at ¶ 25.)

15. On December 10, 2015, Defendant notified Plaintiff that its Broker Opinion of Value ("BOV")[2] for Phase I of the Charlotte Project was $25.5 million. (*Id.* at ¶ 28; Email re: BOV, ECF No. 12.5.) On January 6, 2016, without waiting for Plaintiff to respond to the BOV, Defendant broke ground on the Charlotte Project.

---

[2] Also sometimes referred to as a "broker price opinion" or "comparative market analysis." *See* G.S. §93A-82.

(ECF No. 1 at ¶ 29.) As of the filing of this lawsuit, Plaintiff and Defendant have not come to an agreement on the purchase price, and the parties have not signed a finalized PSA. (*Id.* at ¶ 30.)

16. On June 16, 2017, Plaintiff filed this lawsuit making claims for: equitable estoppel by fraud, alleging that Defendant engaged in fraud by inducing Plaintiff to perform development work and negotiate the Whole Foods Lease by falsely representing, up until January 2015, that Defendant would sell Phase I of the Charlotte Project to Plaintiff for $17.25 million (Count I); tortious interference with prospective economic advantage, alleging that Defendant interfered with Plaintiff's right to enter into a lease agreement directly with Whole Foods (Count II); unfair and deceptive trade practices in violation of the Unfair and Deceptive Trade Practices Act, G.S. § 75-1.1(a) ("UDTPA"), alleging that Defendant's fraud and interference with Plaintiff's relationship with Whole Foods were deceptive (Count III); and, alternatively, recovery in *quantum meruit*, alleging that Plaintiff should be compensated for its services in the development of the Charlotte Project (Count IV).

17. On June 29, 2017, this matter was designated to the North Carolina Business Court pursuant to G.S. § 7A-45.4. (Designation Order, ECF No. 3.) On July 5, 2017, the case was assigned to the undersigned by Order Chief Business Court Judge James L. Gale. (Assignment Order, ECF No. 5.)

18. On August 11, 2017 Defendant filed the Motion and a Memorandum of Law in Support of its Motion to Dismiss (Corrected Memo. Supp. Mot. to Dismiss, ECF No. 12.) On September 7, 2017, Plaintiff filed its amended Memorandum in

Opposition to the Motion. (Memo. Opp. Mot. to Dismiss, ECF No. 14.) On September 25, 2017, Defendant filed its Reply Brief in Support of its Motion to Dismiss (Reply Supp. Mot. to Dismiss, ECF No. 18.) On November 8, 2017, the Court held a hearing on the Motion. The Motion is now ripe for disposition.

## II.     ANALYSIS

### A.  Rule 12(b)(6) standard

19.     In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the [C]omplaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). North Carolina is a notice pleading state. *See, e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 646, 763 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought." *Id.*

20.     Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's

claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). In deciding a motion to dismiss, the Court must construe the Complaint liberally and accept all well-pleaded allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). In addition, the Court may consider documents that are the subject of Plaintiff's Complaint and to which the Complaint specifically refers, including a contract that forms the subject matter of the action. *Oberlin Capital, L.P.*, 147 N.C. App. at 60, 554 S.E.2d at 847.

21.     Defendant seeks dismissal of all of Plaintiff's claims. The Court will analyze each claim individually, but first discusses the significance of the LOI in deciding the Motion.

### B. <u>Plaintiff does not seek to enforce the LOI, but instead ignores the LOI</u>

22.     As a preliminary matter, the Court notes that unlike most of the reported cases involving attempts to enforce terms contained in letters of intent, in this action Plaintiff does not contend that the LOI is a binding contract. This is consistent with the reported cases in North Carolina, which have held that LOI's of the type entered into between the parties to this action—those that are expressly non-binding and contemplate a more detailed future agreement between the parties—usually are not binding agreements. *E.g., JDH Capital, LLC v. Flowers*, 2009 NCBC LEXIS 8, at *15 (N.C. Sup. Ct. Mar. 13, 2009) (finding that the letter of intent at issue

was not a binding contract because it, *inter alia*, stated on its face that it was a "letter of intent and that it is not binding," "contemplate[d] the execution of a more complete agreement," and contained "no language inferring an intent to be bound") (*citing Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consolidated,* 2003 NCBC 3, at *PP 37, 46 (N.C. Super. Ct. Apr. 28, 2003).)); *see also Boyce v. McMahan*, 22 N.C. App. 254, 258, 206 S.E.2d 496, 499 (1974) (holding that the agreement at issue was "made [ ] subject to a more detailed agreement at some specific date to be agreed to by the parties hereto" and was therefore not a binding contract (internal quotation marks omitted)).

23.    As was the case in the above-cited decisions, the LOI in this action contains explicit language stating that the parties will not be bound by its terms unless and until the parties execute a PSA. (ECF No. 12.2 at p. 6.) The LOI provides that "[i]t is not an offer nor is it a binding agreement, but merely an expression of [Plaintiff]'s interest . . . . Neither of us shall be bound until an acceptable [PSA] can be executed by each of us." (ECF No. 12.2 at p. 6.) The LOI also states that "[s]ignificant additional terms and conditions of the [PSA] are yet to be negotiated and neither party is obligated to continue such negotiations. In no event shall any contractual rights or obligations exist until such time as a [PSA] is fully executed and delivered by both parties." (*Id* (italics omitted).)

24.    Although Plaintiff does not allege that the terms of the LOI create a binding contract, Plaintiff contends that Defendant bound itself to a purchase price of $17.25 million prior to the parties executing a final PSA, and attempts to fashion

claims for equitable estoppel, tortious interference, unfair trade practices, and quantum meruit out of this contention. Plaintiff does not argue that the LOI language is ambiguous, or does not reflect the parties' intentions. In fact, Plaintiff ignores the LOI and seeks to have the Court ignore it as well. This is not supported by North Carolina decisions. Rather, courts should not "ignore an initial agreement between the parties that fails to include binding language and specifically states that the agreement is non-binding until a definitive agreement is reached." *JDH Capital*, 2009 NCBC LEXIS 8, at *24.[3] This "is particularly true where the business arrangement being negotiated is one in which a comprehensive agreement is both normal and advisable," such as a complex real estate development project. *Id.* Each of Plaintiff's claims must be analyzed against the backdrop of the terms of the LOI that governed the parties' relationship regarding the Charlotte Project.

## C. North Carolina does not recognize a cause of action for equitable estoppel by fraud and Plaintiff has not alleged breach of an oral contract

25.     Plaintiff's first claim is titled "Equitable Estoppel by Fraud." (ECF No. 1 at p. 9; ¶¶ 33–38.) Plaintiff appears to allege that at or around the time that the parties executed the LOI, Defendant agreed that the price Plaintiff would pay for the retail component of the completed Charlotte Project was $17.25 million. (*Id.* at ¶ 34.) Plaintiff alleges that "at some point between August 2014 and January 2015,

---

[3] In *JDH Capital*, the court granted summary judgment to the defendants and dismissed the plaintiff's claims for breach of the letter of intent, quantum meruit, negligent misrepresentation, fraud, and unfair trade practices, and denied the plaintiff's motion to amend to state a claim for breach of an oral contract on the grounds of futility. 2009 NCBC LEXIS 8.

[Defendant] determined that it would not sell the property to [Plaintiff] for the previously agreed-upon $17.25 million purchase price," but Defendant nonetheless "represented to [Plaintiff] that the agreement stood strong . . . with the intention of inducing [Plaintiff] to continue its development work on the [Charlotte Project]." (*Id.* at ¶ 35.) Plaintiff alleges it relied on Defendant's representations in negotiating the Whole Foods Lease. (*Id.* at ¶ 36.)

26. Defendant argues that the claim for equitable estoppel by fraud should be dismissed because North Carolina does not recognize equitable estoppel as an affirmative cause of action. (ECF No. 12 at p. 9.) Defendant is correct. *See, e.g.*, *Herring v. Volume Merchandise, Inc.*, 252 N.C. 450, 453, 113 S.E.2d 814, 816 (1960) ("Estoppels are protective only, and are to be invoked as shields, and not as offensive weapons."); *Home Elec. Co. of Lenoir, Inc. v. Hall & Underdown Heating & Air Conditioning Co.*, 86 N.C. App. 540, 543, 358 S.E.2d 539, 541 (1987), *aff'd*, 322 N.C. 107, 366 S.E.2d 441 (per curiam) ("North Carolina case law has not approved the doctrine [of estoppel] for affirmative relief."); *Laschkewitsch v. Legal & General America, Inc.*, 247 F. Supp. 3d 710, 721 (E.D.N.C. Mar. 23, 2017) ("North Carolina courts, however, do not recognize estoppel as an affirmative cause of action."); *Krawiec v. Manly*, 2016 NCBC 7, 2016 WL 374734, at \*12 (N.C. Super. Ct. Jan. 22, 2016) ("[T]he doctrine of equitable estoppel is not a basis for an affirmative claim for relief. Rather, the doctrine provides a defense to bar enforcement of opposing claims or affirmative defenses.").

27.     Because the existing law of North Carolina does not support an affirmative cause of action for equitable estoppel by fraud, Defendant's motion to dismiss Plaintiff's attempt to bring an affirmative claim for equitable estoppel by fraud should be GRANTED, and Plaintiff's purported claim should be dismissed with prejudice.

28.     To salvage its first claim, Plaintiff argues that the claim should be treated as a claim for breach of "an oral contract for the sale of land," and that it alleges equitable estoppel by fraud in anticipation of Defendant asserting a defense of statute of frauds. [4] (ECF No. 14 at pp. 8–10.) Plaintiff apparently contends that the Complaint would support a claim that Defendant orally agreed to a $17.25 million purchase price, and that this oral agreement stands separate from the other terms of the LOI and can be enforced despite the failure of the parties to enter into a final PSA. The Court is not persuaded by Plaintiff's argument.

29.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of [the] contract." *McLamb v. T.P. Inc.,* 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005). It is well-established that:

> [A] valid contract between two parties can only exist when the parties assent to the same thing in the same sense, and their minds meet as to all terms. This assent, or meeting of the minds, requires an offer and acceptance in the exact terms and that the acceptance must be communicated to the offeror. If the terms of the offer are changed or any new ones added by the acceptance, there is no meeting of the minds and, consequently, no contract.

---

[4] The Complaint does not expressly allege that Defendant orally accepted the purchase price nor make any reference to the existence of an oral agreement.

*Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985) (internal citations and quotation marks omitted). An acceptance that contains new or differing terms from the offer is not truly acceptance, but a counter-offer. *Id.* Acceptance must be communicated to the offeror in some form sufficient to manifest the offeree's intent to be bound to the exact terms of the offer. *Executive Leasing Associates, Inc. v. Rowland*, 30 N.C. App. 590, 592, 227 S.E.2d 642, 644 (1976). The Complaint does not allege facts that would support an offer, or acceptance, of the $17.25 million purchase price so as to form a separate contract for that single term.

30. First, Plaintiff does not allege that the LOI was, itself, an offer to purchase for $17.25 million. In fact, that figure is not contained in the LOI. The LOI cannot be an offer because the terms of the LOI are incomplete and expressly contemplate the need for further negotiations before the parties could reach a valid and binding final agreement. (ECF No. 12.2 at p. 6.) Both parties made changes to the drafts of the PSA, and a final agreement as to all terms had not been reached when negotiations ceased. (ECF No. 1 at ¶ 30.)

31. To the extent Plaintiff contends that the $17.25 million offer was contained in a draft PSA exchanged with Defendant, such contention is unsupported by the allegations. Plaintiff does not allege that any term contained within the drafts of the PSA was ever expressed in such a way that the receiving party could have understood them to be an offer which the other party could accept to create a contract that would be discrete and separate from the other terms of the draft PSA. Therefore,

Plaintiff has not adequately alleged an offer, oral or otherwise, to create a binding contract regarding the $17.25 million purchase price.

32.     Plaintiff also has not sufficiently alleged that Defendant orally accepted the $17.25 million purchase price. Beyond the statement that Plaintiff and Defendant "agreed that [Defendant] would sell the commercial property . . . to [Plaintiff for $17.25 million" (ECF No. 1 at ¶ 34), Plaintiff does not plead any specific facts in support of Defendant's alleged oral acceptance of the purchase price, such as the date of the acceptance or the identity of Defendant's representative who orally accepted.

33.     The Court is not required to accept Plaintiff's conclusory claim that the parties formed an "oral contract" in the absence of some factual allegations to support such a conclusion. *E.g., Stanback v. Stanback*, 297 N.C. 181, 204, 254 S.E.2d 611, 626 (1979) ("[D]espite the liberal nature of the concept of notice pleading, a complaint must nonetheless state enough to give the substantive elements of at least some legally recognized claim or it is subject to dismissal under Rule 12(b)(6)."); *Skinner v. Reynolds*, 237 N.C. App. 150, 156, 764 S.E.2d 652, 657 (2014) (repeating the *Stanback* standard and holding that because "[p]laintiff does not support these conclusory allegations with alleged facts" the claim for libel per se cannot survive a 12(b)(6) motion to dismiss). Accordingly, the Complaint does not allege the formation of a valid oral contract between the parties.

34.     Finally, in *JDH Capital*, the trial court was faced with a similar argument by the plaintiff that the court framed as "whether [an] unenforceable Letter of Intent may be converted into an enforceable agreement by an oral agreement."

2009 NCBC LEXIS 8, at *23. The court stated that to find the existence of an oral contract would "require[] the [c]ourt to ignore the plain language of the Letter of Intent, which calls for the execution of a detailed final agreement of the type generally associated with similar real estate development projects." *Id*. Similarly, in this case, Plaintiff simply cannot escape the express terms of the LOI by means of claiming an oral contract.

35.     Therefore, to the extent Plaintiff purports to state a claim for breach of oral contract in the Complaint, Defendant's motion to dismiss should be GRANTED, and the claim should be dismissed without prejudice.[5]

## D. **The allegations do not support Plaintiff's claim that Defendant induced Whole Foods to not enter into a lease with Plaintiff**

36.     Plaintiff's second claim is for tortious interference with prospective economic advantage. (ECF No. 1 at p. 10; ¶¶ 39–43.) Plaintiff alleges that Defendant "falsely represent[ed], through the signed LOI and other written and verbal representations to Plaintiff and Whole Foods, that [Defendant] intended to sell the completed Whole Foods facility to [Plaintiff] for $17.25 million." (*Id*. at ¶ 42.) Plaintiff alleges that, absent Defendant's false representation, "Whole Foods would not have signed the lease agreement with [Defendant] and would have entered into the lease agreement directly with [Plaintiff]." (*Id*.)

---

[5] While the Complaint does not contain allegations that support the existence of an oral contract, the Court does not wish to foreclose Plaintiff from alleging a claim for breach of oral contract, if such claim exists and Plaintiff chooses to refile a complaint against Defendant. Therefore, this claim is dismissed without prejudice.

37.     "In order to state a claim for wrongful interference with prospective advantage, the plaintiffs must allege facts to show that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them which would have ensued but for the interference." *Radcliffe v. Avenel Homeowners Ass'n*, 2016 N.C. App. LEXIS 824 at \*46, 789 S.E.2d 893, 911 (2016) (citing *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000)); *Gupton v. Son-Lan Dev. Co.*, 205 N.C. App. 133, 142-43, 695 S.E.2d 763, 770 (2010) (same). "[U]nlawful interference with the freedom to contract is actionable" when it maliciously "prevent[s] the making of a contract . . . with design to injure the plaintiff, or gain some advantage at [plaintiff's] expense." *Coleman v. Whisnant*, 225 N.C. 494, 506, 35 S.E.2d 647, 656 (1945).

38.     "[T]he inducement required to establish a claim for intentional interference with prospective economic advantage requires purposeful conduct intended to influence a third party not to enter into a contract with the claimant." *KRG New Hill Place, LLC v. Springs Investors*, LLC, 2015 NCBC LEXIS 20, at \*15 (N.C. Sup. Ct. Feb. 27, 2015). It is not enough that the defendant's actions caused a third-party to decide not to enter into a contract with the plaintiff. *Id.* at \*16–17 (holding that defendant's failure to complete infrastructure work on plaintiff's property, which led a third-party to back out of an agreement with plaintiff to develop the residential component of the property, was not purposeful action intended to influence the third-party, and therefore insufficient to establish inducement).

39. Plaintiff has not alleged that Defendant engaged in any purposeful action towards Whole Foods that influenced Whole Foods not to enter into a lease with Plaintiff. To the contrary, Plaintiff alleges that Whole Foods requested that Defendant, instead of Plaintiff, be listed as the landlord in the Whole Foods Lease, and that it is "common industry practice" and the "industry standard" for the master developer to be listed as the landlord on the lease executed with retail tenants during the construction phase of a land development project. (ECF No. 1 at ¶¶ 11, 15.) In addition, Plaintiff does not allege that Defendant made any representations directly to Whole Foods in connection with the execution of the LOI or the negotiation of the Whole Foods Lease. Rather, Plaintiff "manag[ed] all aspects of Whole Foods involvement in the project, including site approval, *negotiations of the letter of intent and the lease*, and design of the retail component of the proposed development." (ECF No. 1 at ¶ 10 (emphasis added).) The facts alleged do not support Plaintiff's claim that Defendant induced Whole Foods to enter into the Lease Agreement with Defendant instead of Plaintiff.

40. Because Plaintiff's allegations do not support a claim of intentional interference, Defendant's motion to dismiss Plaintiff's tortious interference with prospective economic advantage claim should be GRANTED and the claim should be dismissed with prejudice.

**E. Since Plaintiff's other claims are dismissed and it has failed to allege any other unfair or deceptive conduct, the UDTPA claim should be dismissed**

41.     In support of its claim for violation of the UDTPA, Plaintiff alleges that Defendant falsely represented that it would sell the retail component of the Charlotte Project to Plaintiff for $17.25 million for the purpose of obtaining the Whole Foods Lease knowing that, once the Whole Foods Lease was executed, Defendant would not sell the retail component to Plaintiff. (ECF No. 1 at ¶¶ 48–49.) Plaintiff alleges that this "bait-and-switch" tactic is an unfair or deceptive trade practice as defined in G.S. § 75-16. (ECF No. 1 at ¶ 50.)

42.     "To establish a prima facie case of unfair and deceptive trade practices, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice, (2) the act was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 303, 603 S.E.2d 147, 161 (2004); *see also Combs & Assocs. v. Kennedy*, 147 N.C. App. 361, 373–74, 555 S.E.2d 634, 642 (2001). "A mere breach of contract, even if intentional, is not an unfair or deceptive act under Chapter 75." *Bob Timberlake Collection, Inc. v. Edwards,* 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006) (citing *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989) and *Skinner v. E. F. Hutton & Co., Inc.*, 314 N.C. 267, 275, 333, S.E.2d 236, 241 (1985)). In order for a breach of contract to provide the basis for a claim for unfair or deceptive trade practices, "a party must show substantial aggravating circumstances attending the breach." *Bob Timberlake,* 176 N.C. App. at 42, 626 S.E.2d at 323. Whether an act or practice is unfair or

deceptive is ultimately a question of law for the Court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56, 714 S.E.2d 162, 167 (2011).

43.     Plaintiff's claim for unfair and deceptive trade practices again relies on the allegation that Defendant breached an agreement to sell the retail component of the Charlotte Project to Plaintiff for $17.25 million, and falsely represented to Plaintiff that it would sell the property for this price. The Court has dismissed Plaintiff's claims for equitable estoppel by fraud, breach of oral contract, and interference with prospective economic advantage, based on the same alleged conduct. Plaintiff has not alleged any other conduct that would support a claim that Defendant engaged in unfair or deceptive practices.

44.     Since Plaintiff's underlying claims have been dismissed, its claim for violation of the UDTPA also should be dismissed. *See, e.g., B&F Slosman v. Sonopress, Inc.*, 148 N.C. App 81, 89, 557 S.E.2d 176, 182 (2001) ("The essence of plaintiff's [UDTPA] claim is that defendant committed fraud and breached an alleged lease. Having determined that plaintiff has failed to make a prima facie case with respect to each of these claims, we likewise conclude plaintiff has not established a claim for unfair and deceptive business practices."); *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 374, 555 S.E.2d 634, 642 (2001) ("[P]laintiff's claim that defendants engaged in unfair and deceptive trade practices rests with its claims for misappropriation of trade secrets, tortious interference with contracts and civil conspiracy. Having determined that the trial court properly granted summary

judgment on each of these claims, we likewise conclude that no claim for unfair and deceptive trade practices exists.").

45. In its brief, Plaintiff appears to argue that the allegations in the Complaint would support a claim for fraudulent misrepresentation sufficient to sustain a cause of action for unfair trade practices. (ECF No. 14 at pp. 16–17.) "Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts." *Hardy v. Toler*, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975).

46. The Court disagrees with Plaintiff's argument. A claim for fraud requires that Plaintiff plead "the time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Bob Timberlake*, 176 N.C. App. at 39, 626 S.E.2d at 321 (quoting *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981) (internal quotations omitted)). "Mere generalities and conclusory allegations of fraud will not suffice." *Sharp v. Teague*, 113 N.C. App. 589, 597, 439 S.E.2d 792, 797 (1994) (quoting *Moore v. Wachovia Bank & Trust Co.*, 30 N.C. App. 390, 391, 226 S.E.2d 833, 835 (1976)). When a section 75-1.1 claim is based on allegations of deceptive conduct, such allegations must be pleaded with particularity. *See, e.g. Topshelf Mgmt. v. Campbell-Ewald Co.*, 117 F. Supp. 3d 722, 731, 215 U.S. Dist. LEXIS 100910, at *21 (M.D.N.C. Aug. 3, 2015) ("Rule 9(b) applies to section 75-1.1 claims alleging detrimental reliance on false or deceptive representations . . . this claim also lacks sufficient particularity under Rule 9(b) and will be dismissed."); *Hilco Transp., Inc. v. Atkins*, 2016 NCBC LEXIS 5, at fn. 5 (N.C. Super. Ct. Jan. 15, 2016).

47.     Plaintiff does not allege the specific dates or specific content of any misrepresentations made by Defendant, nor the identity of the person or persons making such representations. Plaintiff vaguely alleges only that between the "Fall 2014" and January 2015 Defendant "represented to [Plaintiff] that the agreement [to sell the property for $17.25 million] stood strong." (ECF No. 1 at ¶ 46.) Plaintiff has not pleaded fraudulent misrepresentation with adequate specificity, and the Complaint fails to allege a claim for unfair trade practices in violation of the UDTPA.

48.     Defendant's motion to dismiss Plaintiff's claim for unfair or deceptive trade practices should be GRANTED and the claim should be dismissed without prejudice.[6]

## F. Plaintiff's claim for *quantum meruit* fails because the allegations do not support a claim that Plaintiff had an expectation of compensation

49.     Finally, "in the alternative to recovery" under its first three claims, Plaintiff seeks to recover on a theory of *quantum meruit* (unjust enrichment) for services it provided in relation to the Charlotte Project. (ECF No. 1 at p. 12; ¶¶ 51–55.) Plaintiff alleges that in connection with the Charlotte Project, it identified the property to be developed, recruited Defendant to the development team, contributed to the site plan and architectural design, and secured and negotiated the lease with

---

[6] While the allegations of the Complaint does not allege with sufficient particularity the time, content of, or person who made fraudulent misrepresentations that would support a claim for deceptive trade practices, the Court does not wish to foreclose Plaintiff from providing such particularity if such claim exists and Plaintiff chooses to refile a complaint against Defendant. Therefore, this claim is dismissed without prejudice.

Whole Foods. (*Id.* at ¶ 52.) Plaintiff also alleges that Defendant knew that Plaintiff "was acting with the expectation of compensation." (*Id.* at ¶ 53.)

50.     "*Quantum meruit* operates as an equitable remedy based upon a quasi contract [sic] or a contract implied in law which provides a measure of recovery for the reasonable value of services rendered in order to prevent unjust enrichment." *Ron Medlin Constr. v. Harris*, 364 N.C. 577, 589, 704 S.E.2d 486, 488 (2010) (internal quotation marks omitted). "To recover in *quantum meruit*, plaintiff must show: (1) services were rendered to defendants; (2) the services were knowingly and voluntarily accepted; and (3) the services were not given gratuitously." *Envtl. Landscape Design Specialist v. Shields*, 75 N.C. App. 304, 306, 330 S.E.2d 627, 628 (1985).

51.     "In addition, '*quantum meruit* claims require a showing that both parties understood that services were rendered with the expectation of payment.'" *Wing v. Town of Landis*, 165 N.C. App. 691, 693, 599 S.E.2d 431, 433 (2004) (quoting *Scott v. United Carolina Bank*, 130 N.C. App. 426, 429, 503 S.E.2d 149, 152 (1998)). This does not mean that the plaintiff alone had an expectation of compensation, but that the defendant understood that it was expected to compensate the plaintiff for the services. *Twiford v. Waterfield*, 240 N.C. 582, 585, 83 S.E.2d 548, 551 (1954) ("The *quantum meruit* must rest upon an implied contract. It must be made to appear that at the time the services were rendered, payment was intended on the one hand and expected on the other.") (internal citation and quotation marks omitted); *see also Snow v. East*, 96 N.C. App. 59, 63, 384 S.E.2d 689, 692 (1989) (to similar effect).

52.      While Plaintiff contends that it had an "expectation of compensation," and that Defendant understood Plaintiff's expectation, Plaintiff alleges only that its expectation was that Defendant "would sell Plaintiff the . . . property . . . for $17.25 million." (ECF No. 1 at ¶ 53.) Plaintiff does not allege that it expected Defendant to compensate it for any of its efforts in developing the Charlotte Project or for securing the lease with Whole Foods, or that Defendant expected to pay Plaintiff for those efforts. Again, the plain language of the LOI belies such expectations, stating expressly that "the parties agree . . . that any obligation incurred, funds spent and business opportunities lost are at each party's sole risk." (ECF No. 12.2 at p. 6.)

53.      Plaintiff argues that in *JDH Capital,* cited *supra*, this Court "affirmatively found that the value of procuring a lease is recoverable against a party to a failed letter of intent." (ECF No. 14 at p. 18.) Plaintiff contends that since it assisted Defendant in entering into the Whole Foods Lease, it should be compensated for the value of providing that service. (*Id.*)

54.      Plaintiff mischaracterizes *JDH Capital*. In that case, the trial court held that Plaintiff could not recover for the services it provided in the development of the property, including identifying and introducing the defendant to Lowes Foods as a potential anchor tenant, because "[p]laintiff ha[d] failed to establish an expectation that it would be paid for any service." *JDH Capital*, 2009 NCBC LEXIS 8 at *26. The court further explained that

> Parties enter into letters of intent because they have unresolved issues. They understand that there are risks involved because of the clear possibility that no final agreement may be reached. [Plaintiff] is a sophisticated

developer. It drafted the Letter of Intent. It knew that there were risks involved. It knew that [defendant] had reservations and specific desires with respect to her property. At no time did [plaintiff] indicate to [defendant] that she would be expected to pay for any service it provided if a final agreement was not reached. It could have contracted for that protection. Moreover, there is no evidence in this record that [defendant] believed she would have to compensate [plaintiff] if a final agreement was not reached. [Plaintiff] was free at any point to decline performance of any service until it received an agreement to be paid. [Plaintiff] could have eliminated the risks, but it chose not to do so.

Absent some evidence of expectation of payment, there can be no claim for *quantum meruit*. Otherwise, parties would be unable to enter into letters of intent because they would never know what liabilities they might incur if a final deal was not reached.

*Id.* 8 at *26–27.

55.     In *JDH Capital*, the court addressed the additional question of whether the plaintiff could prove the "reasonable value" of services it provided if the plaintiff were able to recover in *quantum meruit*. The Court stated in dicta that had the plaintiff secured a lease with Lowes Foods as an anchor tenant for the development "a different outcome may have resulted" because the lease would provide a basis for determining the reasonable value of a service. *Id.* at *30. Plaintiff's reliance on this language is misplaced. In addition to the fact that the language is dicta, Plaintiff suffers from the same fundamental deficiency as the plaintiff in *JDH Capital*: it cannot allege that it had an expectation of compensation in the face of the express language of the LOI. In fact, the LOI in this case not only states that a binding agreement is conditioned on reaching a final PSA, it has language not present in the

letter of intent in *JDH Capital* expressly stating that all "funds spent" and "business opportunities lost" are at each party's "sole risk." (ECF 12.2 at p. 6.)

56. In conclusion, the Complaint fails to allege facts that would support that Plaintiff had an expectation of compensation for the efforts it undertook on the Charlotte Project. To the contrary, the existence of the LOI as written "necessarily defeats the plaintiff's claim" for recovery under *quantum meruit*. *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). As a result, Defendant's motion to dismiss Plaintiff's claim for recovery under *quantum meruit* should be GRANTED, and the claim should be dismissed with prejudice.

## III. CONCLUSION

THEREFORE, IT IS ORDERED that Defendant's Motion is GRANTED, and all of Plaintiff's claims are DISMISSED, as follows:

1. Plaintiff's first claim for Equitable Estoppel by Fraud is DISMISSED with prejudice.

2. To the extent that Plaintiff attempts to state a claim for Breach of Oral Contract in this Complaint, such claim is DISMISSED without prejudice.

3. Plaintiff's second claim for Tortious Interference with Prospective Economic Advantage is DISMISSED with prejudice.

4. Plaintiff's third claim for Unfair and Deceptive Trade Practices under section 75-1.1 is DISMISSED without prejudice.

5. Plaintiff's fourth claim for Recovery in *Quantum Meruit* is DISMISSED with prejudice.

This, the 24th day of January, 2018.

                                          /s/ Gregory P. McGuire
                                          Gregory P. McGuire
                                          Special Superior Court Judge for
                                          Complex Business Cases